UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
CYNTHIA RICHARDS-DONALD,

                      Plaintiff,                    13-CV-7405 (DAB)

       v.                                  <u>MEMORANDUM AND ORDER</u>

TIAA BOARD OF OVERSEERS; TEACHERS
INSURANCE AND ANNUITY ASSOCIATION OF
AMERICA; TIAA-CREF INDIVIDUAL &
INSTITUTIONAL SERVICES, LLC; and
JARROD FOWLER, in his individual and
official capacities,

                      Defendants.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Before the Court is Defendants' Omnibus Motion to Dismiss.

For the reasons stated herein, the Motion is Granted in Part,

and the Action is transferred to the United States District

Court for the Western District of North Carolina.


I.   <u>Background</u>

     The Operative Complaint, the Third Amended Complaint

("TAC"), was filed on August 13, 2014, alleging claims of

unlawful discrimination and retaliation under Section 1981 of

the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of

the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.,

against Defendants TIAA Board of Overseers, Teachers Insurance

and Annuity Association of America, TIAA-CREF Individual &

Institutional Services, LLC, (collectively, "Corporate

Defendants") and Jarrod Fowler, in his individual and official

capacities (collectively, "Defendants").  Defendants jointly

moved against the TAC, asking the Court to (1) dismiss the TAC

in its entirety as to Defendant Jarrod Fowler for lack of

personal jurisdiction; (2) Dismiss the TAC in its entirety as to

Defendants TIAA Board of Overseers and TIAA-CREF Individual and

Institutional Services, LLC, for failure to state a claim; (3)

dismiss the TAC in its entirety for improper venue or transfer

it to the Western District of North Carolina; and (4) require

Plaintiff to provide a more definite statement under Federal

Rule of Civil Procedure 12(e).  (See ECF Nos. 36-38.)  Plaintiff

opposed Defendants' Motion (ECF Nos. 42-44), and Defendants

filed a brief in reply (ECF No. 46).  Because the Court finds

that transfer is appropriate, the Court only addresses the venue

arguments.  For the reasons stated herein, the Action is

transferred to the United States District Court for the Western

District of North Carolina under 28 U.S.C. §§ 1406(a) and

1404(a).


A. Facts

"On a Rule 12(b)(3) motion to dismiss for improper venue,

the court must take all allegations in the complaint as true,

unless contradicted by the defendants' affidavits." (Micromem

Techs., Inc. v. Dreifus Assocs. Ltd., 14-cv-9145 (LAK) 2015 WL

8375190, at *1 n.3 (S.D.N.Y. Dec. 8, 2015) (citations and

2

internal quotation marks omitted); see also Owens v. L-3
Commc'ns Vertex Aerospace, LLC, No. 12 civ. 8419(RA), 2013 WL
2524365, at *1 (S.D.N.Y. June 7, 2013) ("In ruling on such a
motion, a court may consider evidence outside the four corners
of the complaint, including affidavits and other documentary
evidence, and the facts are construed in the light most
favorable to the plaintiff.'") (citations and internal quotation
marks omitted).)  Accordingly, the following facts relevant to
venue are taken from the TAC and any declarations submitted in
connection with the Motion to Dismiss.  Plaintiff is a female,
African-American former employee of TIAA.  (TAC ¶ 10.)  "TIAA"
is defined in the TAC to include all three Corporate Defendants.
(Id. pg. 1.)  Plaintiff began working for TIAA in 1993 in TIAA's
New York office.  (Id. ¶ 29.)  All three Corporate Defendants
are headquartered in New York but have a local office in
Charlotte, North Carolina.  (See id. ¶¶ 11-13 (listing the same
address for each Corporate Defendant's Charlotte "local
office").)  Plaintiff was moved from the New York TIAA office to
the Charlotte TIAA office in 2000.  (Id. ¶ 30.)  Plaintiff
became a Wealth Management Advisor ("WMA") in 2004 and held that
position until the end of her employment with TIAA in 2013.
(Id. ¶ 31.)  From at least 2010 through the time of Plaintiff's
termination, it appears that Plaintiff had a Louisiana-based
concentration of clients.  (See, e.g., id. ¶¶ 56-62 (describing

3

an incident where Plaintiff was allegedly undermined and undercut by a white male director in Louisiana in connection with a potential investment by Louisiana Public Broadcasting); id. ¶ 63-66 (describing incidents where Plaintiff's direct supervisor allegedly improperly gave sales leads in Plaintiff's Louisiana territory to white colleagues).) Plaintiff does not reference clients or potential clients outside of Louisiana in the TAC.

The TAC generally contains three types of allegations: allegations regarding an allegedly discriminatory environment; allegations regarding her direct supervisor, Jarrod Fowler; and allegations of retaliation. For example, Plaintiff alleges that many African-American employees were forced to leave TIAA due to the African-American employees being paid less than their white colleagues. The TAC alleges that "[b]y 2008, only two minority WMAs remained [in the Charlotte office] and at the time of her termination she was the only minority WMA in the entire Charlotte office." (TAC ¶ 36.) Plaintiff also alleges that her salary was around $85,000, "at the low end of the compensation scale for a WMA at the time, and far less than her white colleagues with similar or lesser experience, qualifications, and production." (Id. ¶ 38; see also id. ¶ 37 (alleging that one of Plaintiff's supervisors had told Plaintiff that "her base salary should be at the top end of the WMA scale (around

4

$150,000/year)".) Plaintiff does not explicitly allege how her base salary was determined, but she ties complaints regarding her base salary to her direct supervisor, Defendant Fowler. (See, e.g., id. ¶¶ 25, 41.) Plaintiff does allege, however, that Defendant TIAA Board of Overseers approved incentive compensation pools for all employees of Corporate Defendants, such as yearly bonus pools, "which directly affected the level of Ms. Richards-Donald's incentive compensation." (Id. ¶ 17.) Although Plaintiff alleges that she was improperly discriminated against with respect to her base salary (see, e.g., id. ¶ 38), Plaintiff does not appear to allege that any incentive compensation was improper other than that her compensation may have been lower due to sales leads in Plaintiff's territory being given to other WMAs. (See id. ¶ ¶ 4 (alleging that "sales leads located in [Plaintiff's] exclusive territory were often given to her white sales colleagues, contrary to policy and practice, seriously damaging her sales figures and potential incentive compensation" and that "Mr. Fowler was the primary offender in this practice").)

Plaintiff also provides examples of times she unsuccessfully attempted to move to more senior positions, which were allegedly awarded to less qualified white employees. (See, e.g., TAC ¶¶ 42-55.) Plaintiff does not indicate in which geographic location these jobs would have been or to where

5

Plaintiff sent her applications, but Plaintiff applied to these positions while Plaintiff was based in the Charlotte office from 2010-2013. (See id.) Plaintiff also alleges various examples of when TIAA employees made racially derogatory statements over the phone, in person, or on Facebook. (Id. ¶¶ 74-77.) Plaintiff does not allege the location where these events allegedly took place, however it appears that they occurred in Plaintiff's office and on the internet. (See id.)

Plaintiff includes many allegations regarding her direct supervisor, Defendant Fowler. Defendant Fowler is a Branch Manager for the West Region of TIAA's Wealth Management group and directly supervised Plaintiff from around December 2009 until the end of Plaintiff's employment with TIAA on September 13, 2013. (Id. ¶ 25.)[1] The TAC alleges that Defendant Fowler "directly had authority over the terms and conditions of [Plaintiff's] employment" and "directly and personally participated in the unlawful and discriminatory and retaliatory policies and practices to which [Plaintiff] was subjected." (Id. ¶ 25; see also id. ¶ 39 ("Mr. Fowler directly controlled the terms and conditions of [Plaintiff's] employment.").)

[1] Plaintiff clarifies in her Declaration that Mr. Fowler "was [Plaintiff's] direct supervisor from or around December 2009 until May 2013, and supervised Plaintiff's direct supervisor, Michael Lyons, from June 2013 until [Plaintiff's] termination in September 2013." (Plaintiff's Decl. ¶ 2.) This distinction does not appear to be relevant with respect to the venue determination the Court makes herein. Plaintiff has not suggested that Mr. Lyons is located in New York or has a stronger connection to New York than Mr. Fowler does.

6

Defendant Fowler works and resides in Texas, however he supervised Wealth Management Advisors, like Plaintiff, in Charlotte, North Carolina; Austin, Texas; Dallas, Texas; Houston, Texas; Little Rock, Arkansas; Lawrence, Kansas; Seattle, Washington; Palo Alto, California; and San Francisco, California. (See id. ¶ 26; Declaration of Eric B. Sigda in Support of Defendants' Omnibus Motion to Dismiss, Ex. C ¶ 5 (Declaration of Jarrod Fowler dated November 19, 2013 ("Fowler Decl.)) (ECF No. 37).) Defendant Fowler has "never supervised an employee who worked in New York." (Fowler Decl. ¶ 5.) Although Defendant Fowler resides in Texas, "[Plaintiff's] home office was in TIAA's Charlotte, North Carolina location, and that is where [Mr. Fowler] would direct work-related correspondence to [Plaintiff]." (Id. ¶ 7.) Mr. Fowler's direct supervisor, Chris Weyruach, Senior Managing Director of Wealth Management, is based in Corporate Defendants' Roseland, New Jersey office. (Declaration of Cynthia Richards-Donald dated Jan. 15, 2014 ¶ 18 (ECF No. 44) ("Plaintiff's Decl."); see also TAC ¶ 21.) Mr. Weyrauch's direct supervisor, Kathie Andrade, Executive Vice President of Wealth Management, appears to be based in Corporate Defendants' Providence, Rhode Island office. (Plaintiff's Decl. ¶ 19 (attesting that "Ms. Andrade is based in Corporate Defendants' Providence, Rhode Island, office."); but see TAC ¶ 28 ("Upon information and belief, Mr. Fowler performed

7

his job responsibilities in accordance with the guidelines and policies promulgated by Mr. Ferguson and Kathie Andrade, both of whom are located in Defendants' New York City headquarters.").)[2] Kathie Andrade directly reports to Mr. Ferguson, who is based in Corporate Defendants' New York office. (TAC ¶¶ 21, 28.) Mr. Fowler has never directly reported to anyone whose office was in New York. (Fowler Decl. ¶ 6.) Plaintiff alleges generally that "Mr. Fowler performed his job responsibilities in accordance with the guidelines and policies promulgated by Mr. Ferguson and Kathie Andrade, both of whom are located in Defendants' New York City headquarters." (TAC ¶ 28.)

Plaintiff alleges that "[i]n his position as her direct supervisor, Mr. Fowler discriminated against [Plaintiff] on the basis of her race." (Id. ¶ 40.) For example, Plaintiff alleges that in 2010 she did not receive a salary raise that she expected until Plaintiff complained to Defendant Fowler, and even then, the raise awarded was less than increases received by similarly situated white colleagues. (Id. ¶ 41.) Plaintiff also alleges that "Mr. Fowler directly discriminated against [Plaintiff] on the basis of her race by routinely and improperly giving leads located in [Plaintiff's] exclusive sales territory to her white colleagues, directly damaging her sales potential."

---

[2] The Court notes the inconsistency in the TAC and Plaintiff's Declaration. The location of this one individual, however, does not alter the Court's determination overall as to proper venue.

8

(Id. ¶ 63; see also id. ¶¶ 64-67 (providing examples of times
Defendant Fowler allegedly directed Plaintiff's sales leads to
white colleagues).)

Plaintiff also alleges retaliation in response to various
complaints Plaintiff made to TIAA. For example, in September of
2009, Plaintiff sent a memorandum to Gina Maltese, "a former HR
representative" "based in Corporate Defendants' Denver, Colorado
office," regarding racially-related incidents affecting two of
Plaintiff's African-American colleagues. (TAC ¶¶ 78-79;
Plaintiff's Decl. ¶ 11.) Plaintiff alleges that TIAA failed to
take any remedial action. (TAC ¶ 80.) Plaintiff also alleges
that in December 2011, "at the urging of Russell Noles, Senior
Managing Director & Chief Strategy Officer at TIAA," who is
based in New York, Plaintiff filed a report with the TIAA
employee hotline voicing her concerns about lack of diversity,
barriers to advancement for minority employees, and the "overall
environment of racism." (Id. ¶ 81; Plaintiff's Decl. ¶ 17.)
Plaintiff states in her Declaration, but not in the TAC, that
"Josetta Berardi, HR Business Partner [who] is based in
Corporate Defendants' Charlotte, North Carolina office"
"contacted [Plaintiff] in or around January 2012 about an
anonymous complaint [Plaintiff] submitted over the Company-wide
employee hotline in or around December 2011." (Plaintiff's
Decl. ¶ 12.) Plaintiff also states in her Declaration that she

9

communicated with Joanna Gonzalez, Manager of Employee Relations whose email signature block indicates that she is based in New York, regarding this complaint. (Id. ¶ 13.)  The extent of Plaintiff's communications with this purportedly New York-based employee is not alleged in the TAC or included in Plaintiff's Declaration.

Plaintiff also alleges that TIAA had a corporate policy that only required that minority candidates be interviewed, but not necessarily hired. (TAC ¶ 83.)  Plaintiff alleges that she "immediately reached out to Russell Noles, who asked her if he could forward her complaint to people within TIAA who he felt could help change this racially discriminatory and pernicious practice." (Id. ¶ 84.)  Plaintiff also shared her concerns "about the lack of diversity at TIAA and the discrimination Plaintiff had suffered" to Stephanie Bell-Rose, a Senior Managing Director based in New York. (TAC ¶¶ 86-87; Plaintiff's Declaration ¶ 15.)  Plaintiff had met Ms. Bell-Rose when Plaintiff was named TIAA's National Chair for African-American and Caribbean Resource Groups in April of 2013. (TAC ¶ 85-86.)  Ms. Bell-Rose informed Plaintiff that Ms. Bell-Rose would convey Plaintiff's concerns to Roger Ferguson, the President and CEO of the TIAA-CREF brand; Skipp Spriggs, Executive Vice President and Chief Human Resources Officer; and Jerome Miller, Chief Diversity and Inclusion Officer. (TAC ¶ 87; Plaintiff's Decl. ¶

10

15.)  Roger Ferguson, Chief Executive Officer of the TIAA-CREF
brand, is based in Corporate Defendants' New York office.
(Plaintiff's Decl. ¶ 6.)  Skipp Spriggs, Executive Vice
President and Chief Human Resources Officer, "who has authority
and supervisory power over HR functions for all of the Corporate
Defendants, is based in Corporate Defendants' Charlotte, North
Carolina office."  (Id. ¶ 10.)  Jerome Miller, Chief Diversity
and Inclusion Officer, is also based in Corporate Defendants'
Charlotte, North Carolina office.  (Id. ¶ 16.)  Plaintiff met
with Mr. Miller in May 2013 and raised her concerns about being
compensated less than white colleagues.  (Id. ¶ 16; TAC ¶ 89.)
Plaintiff states in her Declaration, but does not allege in the
TAC, that Eileen McNerney, Director of Employee Relations, based
in Corporate Defendants' New York office, put Plaintiff in touch
with Joanne Gonzalez, Manager of Employee Relations with a
signature block holding herself out as being based in New York,
to discuss Plaintiff's conversation with Mr. Miller.
(Plaintiff's Decl. ¶¶ 13-14.)  The extent of Plaintiff's
communication with Ms. Gonzalez is unknown as no other details
are provided in Plaintiff's Declaration, and Ms. Gonzalez is not
referenced in the TAC.

Plaintiff alleges that less than one month after this
complaint to upper management, TIAA announced a reduction in
force and that Plaintiff's position in Charlotte was being

11

eliminated. (TAC ¶ 90.) Defendant Fowler communicated

Plaintiff's termination to Plaintiff, and Josetta Berardi, HR

Business Partner based in Corporate Defendants' Charlotte, North

Carolina office, "also was on the June 2013 telephone conference

during which Mr. Fowler communicated [Plaintiff's] termination

to [Plaintiff.]" (Plaintiff's Decl. ¶¶ 5, 12.) Plaintiff

alleges and declares that, although TIAA claims that Plaintiff

had the choice of signing a separation agreement or be relocated

to New Orleans, Defendant "Fowler only presented [Plaintiff]

with a separation agreement and release of claims, and

repeatedly demanded that [Plaintiff] sign it in an attempt to

end [Plaintiff's] employment with and force [Plaintiff] out of

TIAA . . . ." (TAC ¶ 91; see also Plaintiff's Decl. ¶ 5.)

Plaintiff states in her Declaration that Charlotte-based HR

Business Partner Berardi signed Plaintiff's separation agreement

with the company. (Plaintiff's Decl. ¶ 12.) Plaintiff alleges

that "TIAA transparently used its [reduction in force] as an

opportunity to force [Plaintiff] out of the Company for

consistently daring to challenge the institutional culture of

racism and discrimination that pervades TIAA . . . ." (TAC ¶

92.) Plaintiff submitted a copy of the separation agreement

with her materials in opposition to the Motion. (See

Affirmation of Lawrence M. Pearson, Ex. A (ECF No. 43).)

Plaintiff notes in her opposition materials that Corporate

Defendants' address for the New York headquarters is listed on the bottom of the first page of the separation agreement. (<u>See</u> Opp. at 20.)

## II. <u>Applicable Law</u>

A plaintiff opposing a motion to dismiss for improper venue must make a <u>prima facie</u> showing that venue is proper in the chosen forum. (<u>See, e.g.</u>, <u>Micromem</u>, 2015 WL 8375190, at *4 (citation omitted); <u>see also</u> <u>Gulf Ins. Co. v. Glasbrenner</u>, 417 F.3d 353, 355 (2d Cir. 2005) (stating that the plaintiff only needs to make a <u>prima facie</u> showing of venue if the Court chooses to rely on pleadings and affidavits rather than hold an evidentiary hearing).) In actions involving multiple defendants and claims, the plaintiff must show that venue is proper for each claim against each defendant. (<u>Micromem</u>, 2015 WL 8375190, at *4 (citations omitted).) If the chosen forum is improper, the Court has discretion to dismiss the case or transfer it to a district where venue is proper. (28 U.S.C. § 1406(a).)

Here, Plaintiff asserts claims under both Section 1981 against all Defendants and Title VII against the Corporate Defendants. (<u>See</u> Opp. at 20 n.8 (clarifying that "Plaintiff does not bring Title VII claims against Jarrod Fowler individually").) Plaintiff alleges that "[v]enue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because

13

[Corporate Defendants'] headquarters are located within the
Southern District of New York and a substantial part of the
events or omissions giving rise to this action, including
unlawful employment practices alleged herein, occurred in this
district." (TAC ¶ 7.)  However, only Plaintiff's Section 1981
claims are governed by 28 U.S.C. § 1391.  This is because venue
in Title VII actions is governed by 42 U.S.C. § 2000e-5(f),
which provides in relevant part:

> [A]n action may be brought in any judicial district in
> the State in which the unlawful employment practice is
> alleged to have been committed, in the judicial
> district in which the employment records relevant to
> such practice are maintained and administered, or in
> the judicial district in which the aggrieved person
> would have worked but for the alleged unlawful
> employment practice, but if the respondent is not
> found within any such district, such an action may be
> brought within the judicial district in which the
> respondent has his principal office.

(42 U.S.C. § 2000e-5(f)(3); Owens, 2013 WL 2524365, at *2; see
also Cook v. UBS Fin. Servs., Inc., No. 05 Civ. 8842(SHS), 2006
WL 760284, at *3 (S.D.N.Y. Mar. 21, 2006) ("Venue over the Title
VII claim, on the other hand, is not determined by the general
venue statute, but rather is 'strictly governed' by 42 U.S.C. §
2000e-5(f)(3)." (citation omitted))  "In determining proper
venue under this statute, a court must first look to the situs
of any one of the first three criteria. . . . The Court may look
to the district in which the employer's principal office is
located only if venue cannot be laid in one of the other three

14

possible districts specified." (Owens, 2013 WL 2524365, at *2
(citations omitted).)

Plaintiff's Section 1981 claims are governed by the general
venue provision, which provides in relevant part:

> (b) Venue in general.--A civil action may be brought
> in--
>
> (1) a judicial district in which any defendant
> resides, if all defendants are residents of the State
> in which the district is located;
>
> (2) a judicial district in which a substantial part of
> the events or omissions giving rise to the claim
> occurred, or a substantial part of property that is
> the subject of the action is situated; or
>
> (3) if there is no district in which an action may
> otherwise be brought as provided in this section, any
> judicial district in which any defendant is subject to
> the court's personal jurisdiction with respect to such
> action.

(28 U.S.C. § 1391(b).)  The Second Circuit has "caution[ed]
district courts to take seriously the adjective 'substantial.'"
(Gulf Ins., 417 F.3d at 357.)  The Second Circuit further
explained that "when a plaintiff relies on § 1391(b)(2) to
defeat a venue challenge, a two-part inquiry is appropriate."
(Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 432 (2d Cir.
2005); see also Micromem, 2015 WL 8375190, at *4.)  "First, a
court should identify the nature of the claims and the acts or
omissions that the plaintiff alleges give rise to those claims.
Second, the court should determine whether a substantial part of

15

those acts or omissions occurred in the district where suit was filed . . . ." (Daniel, 428 F.3d at 432 (citing Gulf Ins., 417 F.3d at 357); Micromem, 2015 WL 8375190, at *4 (citing Daniel, 428 F.3d at 432).)  "The circuit has cautioned district courts to take seriously the adjective 'substantial,' explaining that venue is proper only if 'significant events or omissions material to the plaintiff's claim' occurred in the chosen district." (Micromem, 2015 WL 8375190, at *4 (emphasis in original) (quoting Daniel, 428 F.3d at 432) (internal quotation marks omitted); see also Gulf Ins., 417 F.3d at 357 ("That means for venue to be proper, significant events or omissions material to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere.") (emphasis in original).)  In fact, the "'substantial part test' is more rigorous than the minimum contacts test employed in personal jurisdiction inquiries." (Micromem, 2015 WL 8375190, at *4 (quoting Gulf Ins., 417 F.3d at 357) (internal quotation marks omitted).)  "'Substantiality' for venue purposes is more a qualitative than a quantitative  inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." (Daniel, 428 F.3d at 432-33 (citation omitted).)  "When material acts or omissions within the forum bear a close nexus to the claims, they are

16

properly deemed 'significant' and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue." (<u>Id.</u> at 433 (citation omitted).)

III. <u>Application</u>

    A. <u>Claims Against Jarrod Fowler</u>

As clarified in Plaintiff's briefing, Plaintiff only brings Section 1981 claims against Defendant Fowler, and venue for those claims is governed by the general venue statute. Plaintiff relies on 28 U.S.C. § 1391(b) and (c)[3] in the TAC, however her arguments in opposition to the Motion rely only on subsection (b)(2). (<u>See</u> Opp. at 18.) Venue is improper in the Southern District of New York, however, because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in the Western District of North Carolina. (<u>See</u> 28 U.S.C. § 1391(b)(2).) The Court's first step is to "identify the nature of the claims and the acts or omissions that [Plaintiff] alleges give rise to those claims." (<u>Micromem</u>, 2015 WL 8375190, at *4.) The nature of the claims against Defendant Fowler relate to his failure to provide Plaintiff a base pay commensurate with similarly situated white colleagues, his steering of leads in Plaintiff's territory to white colleagues,

---

[3] 28 U.S.C. § 1391(c) defines "residency" and does not itself establish the requisites for pleading venue.

and his improperly terminating Plaintiff and not providing her
an opportunity to relocate to New Orleans.  (See, e.g., TAC ¶¶
41, 63-67, 90-92.)  Next, the Court "should determine whether a
substantial part of those acts or omissions occurred in the
district where suit was filed."  (Micromem, 2015 WL 8375190, at
*4.)  Absolutely none of these allegations against Mr. Fowler
are alleged to have occurred in the Southern District of New
York.  The extent of the connection between the claims against
Mr. Fowler and the Southern District of New York are that,
"[u]pon information and belief, Mr. Fowler performed his job
responsibilities in accordance with the guidelines and policies
promulgated by Mr. Ferguson and Kathie Andrade, both of whom are
located in Defendants' New York City headquarters."  (TAC ¶ 28.)[4]
Taking these allegations as true, the TAC still does not allege
any discriminatory policy or practice that Mr. Ferguson or Ms.
Andrade promulgated in New York – much more any policy that they
created and that Mr. Fowler was following.  Instead, it appears
that the TAC merely attempts to connect the allegations to New
York because the company is headquartered there.  Alleging some
connection between the claims and the forum is insufficient for
Plaintiff to meet her burden at this stage.  (See, e.g.,
Micromem, 2015 WL 8375190, at *6 ("This is not to say that no

---

[4] Plaintiff provides in her Declaration that Ms. Andrade is located in
Providence, Rhode Island.  (Plaintiff's Decl. ¶ 19.)

18

act or omission giving rise to plaintiffs' claims occurred in
this district. . . . This Court's task is to determine whether
the events that took place in this district compose a
substantial part of plaintiffs' claims.").) Accordingly, "a
close nexus [between the material acts and omissions and the
forum] is lacking" and thus "so too is the substantiality
necessary to support venue." (See <u>Daniel</u>, 428 F.3d at 433
(citation omitted).)

Venue would also be improper under subsection (b)(1), as
that subsection confers venue in "a judicial district in which
any defendant resides, if all defendants are residents of the
State in which the district is located." (28 U.S.C. §
1391(b)(1).) Defendant Fowler resides in Texas, and thus all
Defendants do not reside in the state of New York, rendering
subsection (b)(1) inapplicable. (<u>Gulf Ins.</u>, 417 F.3d at 356
("The defendants thus reside in different states, and subsection
(1) does not apply.").) Plaintiff may not rely on subsection
(b)(3) either. Subsection (b)(3) provides that a civil action
may be brought in any district in which any defendant is subject
to personal jurisdiction only "if there is no district in which
an action may otherwise be brought as provided in this section."
(28 U.S.C. § 1391(b)(3).) Because the Court finds that venue
can properly be laid in the Western District of North Carolina,
subsection (b)(3) is also inapplicable, and Plaintiff has not

19

purported to rely on it. (See, e.g., Daniel, 428 F.3d at 435 ("Thus, because plaintiffs could have satisfied § 1391(b)(2) in the Western District of Michigan, they cannot rely on § 1391(b)(3) to support venue in the Western District of New York.").)

### B. Claims Against Corporate Defendants

The TAC alleges retaliation and discrimination claims under Section 1981 and Title VII against Corporate Defendants. Venue for Title VII claims may lie (1) in any judicial district in the State where the unlawful employment practice is alleged to have been committed, (2) in the judicial district where the employment records relevant to such practices are maintained and administered, (3) in the judicial district in which Plaintiff would have worked but for the unlawful employment practice, or, (4) if Defendants cannot be found in any of those districts, then venue may lie in the judicial district in which the Defendants have their principal office. (See 42 U.S.C. § 2000e-5(f).)

Plaintiff did not rely on Title VII's specific venue provision in the TAC, however Plaintiff argues in her opposition brief that "Plaintiff more than sufficiently alleged that the most pertinent employment records relevant to Plaintiff's unlawful termination were maintained and administered in New

20

York." (Opp. at 20.) Plaintiff further argues that "the separation agreement that Plaintiff was provided during her termination meeting listed Corporate Defendants' address in New York, which unambiguously indicates that Defendants maintained and administered documents pertaining to Plaintiff's unlawful termination in New York." (Id. (citing Plaintiff's Decl.; Pearson Decl., Ex. A)).) Despite these arguments, the Court cannot identify any allegations in the TAC or statements in any of the Declarations addressing where employment records were maintained or administered.

Plaintiff cannot find support in other language of Title VII's venue provision either, however this is a closer call. Although it appears that Plaintiff tries to argue that TIAA has some central discriminatory policy, Plaintiff does not, and perhaps cannot, explicitly allege such. In fact, many, if not all, of the discriminatory unemployment practices relevant to Plaintiff's claims are alleged to have been committed in, or are somehow tied to, Charlotte, North Carolina. The connections to New York, on the other hand, are slim and vague. The only allegations connecting the improper conduct to this District are that (1) Corporate Defendants share common ownership, directors/officers, and financial control and are operated as a single enterprise (TAC ¶ 15); (2) TIAA Board of Overseers approved yearly budgets for Corporate Defendants and incentive

21

compensation pools for Corporate Defendants' employees, (id. ¶¶
16-17); (3) the New York based President and CEO of the TIAA-
CREF brand "has decision making authority, including the ability
to create and institute corporate policy" for two of the three
Corporate Defendants, (id. ¶ 20); (4) there is a four-level
chain of command between Plaintiff's direct supervisor and the
New York-based President and CEO of the TIAA-CREF brand, (id. ¶
21); (5) Plaintiff's direct supervisor performed his
responsibilities in accordance with policies promulgated by the
President and CEO of the TIAA-CREF brand and the Executive Vice
President of Wealth Management, who are either located in New
York or New York and Rhode Island (id. ¶ 28; Plaintiff's Decl.
19); (6) there are Executive Management Team meetings in New
York, (Plaintiff's Decl. ¶ 10);[5] and (7) some New York based
employees encouraged Plaintiff to contact human resources
employees to share Plaintiff's concerns regarding discrimination
on the basis of race, (see, e.g., Plaintiff's Decl. ¶¶ 12-17).
The TAC does not allege, however, that the unlawful employment
practices of which Plaintiff complains are alleged to have
occurred in New York or were the result of policies promulgated
by authorities in New York. (See Cook, 2006 WL 760284, at *4

---

[5] Notably, these Executive Management Team meetings are not referenced in the
TAC. Plaintiff does not explain in her Declaration what Executive Management
Team meetings are, why they are relevant, or whether any policies created at
these meetings are policies for which Plaintiff seeks redress.

(finding venue improper and distinguishing out of district case where "district judge ruled that venue was proper because the parent company exercised such 'control' over the 'development and enforcement of its personnel policies and practices' that 'the alleged unlawful employment practice' could be considered to have taken place in the parent company's district."); id. at *3-4 (dismissing for improper venue where broad-based personnel policies may have been approved at the company's New York headquarters, but the specific personnel decisions impacting plaintiff occurred in Maryland); see also Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 474-75 (S.D.N.Y. 2013) (explaining that where a plaintiff alleges that a corporate policy developed in the company's headquarters has a disparate impact throughout the company, the relevant employment practice is committed where the company's headquarters is located, and finding venue proper in district where company was headquartered because plaintiff brought a disparate impact claim challenging company-wide policies, plaintiff plausibly alleged that the policies and practices complained of emanated from the company's headquarters, and defendants had not submitted evidence contradicting that statement);[6] Turnley v. Banc of Am. Investment

---

[6] Plaintiff here does not appear to allege a disparate impact claim. The Court in Kassman noted that some courts will not apply that same rationale where the plaintiff only alleges a disparate treatment claim, and not a disparate impact claim. (Kassman, 925 F. Supp. 2d at 474.)

Case 3:16-cv-00135-FDW-DCK   Document 48   Filed 03/15/16   Page 23 of 33

<u>Servs. Inc.</u>, 576 F. Supp. 2d 204, 216 & n.13 (D. Mass. 2008)
(allowing suit in district where defendants' principal office is
located because plaintiffs made specific allegations that the
employment practices complained of, allocating decision-making
authority to local managers, resulted from decisions made in the
company's corporate headquarters, but warning courts to "be
careful not to allow plaintiffs to undermine Congress' intent in
drafting Title VII's special venue provision" and suggesting
that "plaintiffs may not sue defendants in their principal
places of business by merely alleging a general hierarchical
structure").)  In fact, the TAC alleges that they occurred in
Charlotte, North Carolina.  For example, Plaintiff alleges that
Human Resources had an improper policy that only required that
minority candidates be interviewed, and not hired.  Plaintiff
also alleges, however, that the Executive Vice President and
Chief Human Resources Officer with authority and supervisory
power over all human resources functions for all Corporate
Defendants is based in Charlotte, North Carolina.  (Plaintiff's
Decl. ¶ 10.)[7]  Plaintiff also alleges that she was improperly

---

[7] Although Plaintiff sometimes references a centralized HR department, (<u>see,
e.g.</u>, Plaintiff's Decl. ¶ 22), Plaintiff never alleges where this centralized
department is located.  Notably, when describing the HR department in New
York, Plaintiff describes "Corporate Defendants' HR department in its New
York City headquarters", which "houses many senior HR officials, particularly
those who handle employee complaints." (<u>Id.</u> ¶ 9.)  Plaintiff does not allege
that the New York City HR department is the centralized HR department, and in
fact, almost all of the HR employees Plaintiff describes are located outside
of New York.  (<u>See, e.g.</u>, Plaintiff's Decl. ¶ 10 (Executive Vice President
and Chief Human Resources Officer based in Charlotte), ¶ 11 (Gina Maltese,

denied promotional opportunities during the 2010-2013 time
period while Plaintiff was in Charlotte, North Carolina. (See
TAC ¶¶ 30-31, 42-54.) While Plaintiff references contacting
human resources employees with respect to these applications,
Plaintiff does not aver where these employees are located, and
Plaintiff does attest that the leader of the human resources
group with decision-making authority is based in Charlotte.
(Plaintiff's Decl. ¶ 10.) Plaintiff's allegations regarding
disparate base pay are tied to her direct supervisor. (See,
e.g., TAC ¶ 41 (alleging that Plaintiff was entitled to a raise
but did not receive one until she complained to Mr. Fowler), ¶
25 (alleging that Mr. Fowler directly had authority over the
terms and conditions of Plaintiff's employment).) Plaintiff's
supervisor, Mr. Fowler, is located in Texas but directs work-
related correspondence to Plaintiff in Charlotte, North
Carolina. (Fowler Decl. ¶ 7.) Although Plaintiff alleges that
TIAA Board of Overseers approved incentive compensation for
Corporate Defendants' employees, Plaintiff has not alleged that
those approvals occurred in New York or that her incentive
compensation was even improper.

Plaintiff attempts to tie her retaliation claims to
individuals in New York, however Plaintiff's Declaration

former HR representative, based in Colorado), ¶ 12 (Josetta Berardi, HR
Business Partner, based in Charlotte), 16 (Chief Diversity and Inclusion
Officer, based in Charlotte).)

undercuts any support she attempts to find in the TAC.  Notably, although Plaintiff's claims have some connection to New York, the New York contacts appear to stem from Plaintiff's contacts with New York rather than Defendants' allegedly improper conduct.  For example, Plaintiff alleges that she was retaliated against after making complaints to management regarding discrimination and disparate treatment.  However, these complaints were directed to and handled by Corporate Defendants' employees outside of New York.  For example, Plaintiff alleges that in 2009 Plaintiff sent an eight page memorandum to Gina Maltese in the Human Resources Department in Colorado describing incidents affecting two of Plaintiff's African-American colleagues.  (TAC ¶ 78; Plaintiff's Decl. 11.)   On another occasion, a Senior Managing Director & Chief Strategy Officer based in New York encouraged Plaintiff to report her concerns to the company hotline.  (TAC ¶ 81; Plaintiff's Decl. 17.)  An "HR Business Partner" based in Corporate Defendants' Charlotte, North Carolina office contacted Plaintiff in response to her complaint submitted over the employee hotline.  (Plaintiff's Decl. ¶ 12.)  A few months later, at the encouragement of another New York based employee, Ms. Bell-Rose, who Plaintiff met through a leadership role Plaintiff received, Plaintiff spoke with the "Chief Diversity and Inclusion Officer," who is based in Corporate Defendants' Charlotte, North Carolina office,

regarding disparate pay. (Id. ¶ 16.) The TAC and Plaintiff's Declaration demonstrate that the New York based employees with whom Plaintiff spoke directed Plaintiff to follow up with other individuals outside of this District. Plaintiff states in her Declaration, but not in the TAC, that on two occasions Plaintiff was also put into contact with an HR representative with an email signature block holding herself out as being in New York, however there is absolutely no other information regarding these contacts or that individual.

Finally, Plaintiff's alleged retaliatory termination was communicated to her by her Texas-based supervisor in tandem with a Charlotte-based human resources business partner. (Plaintiff's Decl. ¶¶ 5, 12.) Plaintiff does not allege that the decision to terminate her was based on any decision or policy articulated in New York.[8] Accordingly, the unlawful employment practices occurred in the Western District of North Carolina.

Plaintiff alleges that she would have worked in Charlotte, or possibly in New Orleans, had she not been improperly

---

[8] Although Plaintiff attempts to beef up her pleadings through her Declaration by stating that "Mr. Fowler had to make, recommend and/or implement employment decisions regarding terminations, promotions, sales lead assignments, and compensation matters in concert with his supervisory chain of command and Corporate Defendants' Human Resources ('HR') department," (Plaintiff's Decl. ¶ 4), none of Mr. Fowler's direct supervisors were located in New York, and the Executive Vice President and Chief Human Resources Officer with authority and supervisory power over all human resources functions for all Corporate Defendants is based in Charlotte. (Id. ¶¶ 10, 18-19.)

terminated, and 42 U.S.C. § 2000e-5(f)(3) would lay venue in one of those districts.  Finally, because Defendants can be found in the Western District of North Carolina, the catch all provision laying venue where Defendants have their principal office is not applicable.

Plaintiff's Section 1981 claims suffer from many of the same flaws.  Plaintiff cannot rely on 28 U.S.C. 1391(b)(1) because all Defendants do not reside in New York.  As demonstrated above, a substantial part of the events or omissions giving rise to Plaintiff's claims did not occur in this District. (See 28 U.S.C. § 1391(b)(2).)  Finally, Plaintiff cannot rely on the catch all provision because venue can be properly laid in the Western District of North Carolina.

IV. Transfer

A. Section 1406(a)

Transfer, rather than dismissal, is appropriate where Plaintiff's Title VII claims would be barred by the statute of limitations if the Court dismissed the case instead of transferring it.  (See, e.g., Owens, 2013 WL 2524365, at *3; see also Daniel, 428 F.3d at 435.)  Plaintiff's EEOC right-to-sue letter was issued on May 15, 2014, (Sigda Decl., Ex. D), and a Title VII action must be brought within ninety days of the issuance of such letter.  Dismissing the case would thus not be

28

in the interests of justice, and accordingly the case will be transferred to the Western District of North Carolina.

### B. Section 1404(a)

Even if venue were proper in the Southern District of New York, the Court would transfer the Action to the Western District of North Carolina pursuant to Section 1404(a). The Court may transfer an action pursuant to 28 U.S.C. § 1404(a) even when venue is proper in the Southern District of New York. (28 U.S.C. § 1404(a); Blum v. Salomon, No. 06 CV 3149 WHP, 2006 WL 3851157, at *3 (S.D.N.Y. Dec. 28, 2006) (collecting cases).) Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." (28 U.S.C. § 1404(a).) "Thus, in determining whether a transfer is appropriate under § 1404(a), 'courts examine: (1) whether the action could have been brought in the proposed transferee forum; and (2) whether the transfer would promote the convenience of parties and witnesses and would be in the interests of justice.'" (Blum, 2006 WL 3851157, at *3 (collecting cases).) Although Defendants moved to dismiss or transfer under Section 1406(a), rather than 1404(a), the Court may transfer an action pursuant to Section 1404(a) sua sponte. (See Lead Indus. Ass'n,

29

Inc. v. Occupational Safety and Health Admin., 610 F.2d 70, 79 &
n.17 (2d Cir. 1979); Benjamin v. City of New York, No. 15 Civ.
2220(KPF), 2015 WL 1632459, at *1 (S.D.N.Y. Apr. 13, 2015)
(citation omitted); Blum, 2006 WL 3851157, at *3 (collecting
cases).)  Ordinarily transfer sua sponte is appropriate only
after giving the parties notice and an opportunity to be heard.
(Benjamin, 2015 WL 1632459, at *1 (citation omitted); but see
Blum, 2006 WL 3851157, at *3 (transferring pursuant to Section
1404(a) where Defendants moved under Section 1406(a) without
addressing notice and an opportunity to be heard).)  Here, sua
sponte transfer is appropriate because, although Defendants
moved under Section 1406(a), Plaintiff, in her briefing opposing
the Motion, argued against transfer under Section 1404(a) and
not 1406(a).  (See Opp. at 18-25.)  Accordingly, because the
Party opposing transfer has briefed the issue, sua sponte
transfer is appropriate.  (See, e.g., Blum, 2006 WL 3851157, at
*3; see also Unlimited Care, Inc. v. Visiting Nurse Ass'n of E.
Mass., Inc., 42 F. Supp. 2d 327, 333 n.4 (S.D.N.Y. 1999)
(finding sua sponte § 1404(a) transfer appropriate where the
issue of venue had been raised and briefed by the parties,
plaintiff had requested a transfer in lieu of dismissal, and
defendant had an opportunity to object to this request in its
reply papers); Saferstein v. Paul, Mardinly, Durham, James,
Flandreau & Rodgers, P.C., 927 F. Supp. 731, 737 (S.D.N.Y. 1996)

30

(finding sua sponte transfer under § 1404(a) appropriate where the parties had briefed dismissal for improper venue under § 1406(a)).)

Neither Plaintiff nor Defendants have argued that venue in the Western District of North Carolina would be improper. (See also Motion at 19 ("TIAA can be 'found' in Charlotte, North Carolina."); id. at 13 (stating that "venue can properly be laid in the Western District of North Carolina".).) Accordingly, the Court must determine whether transfer would promote the interests of justice and the convenience of the Parties, analyzing the following factors, with no single factor being determinative:

> (1) the place where the operative facts occurred; (2) the convenience of the parties; (3) the convenience of the witnesses; (4) the relative ease of access of proof; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the forum's familiarity with the governing law; (7) trial efficiency and the interests of justice; and (8) the plaintiff's choice of forum.

(Blum, 2006 WL 3851157, at *4 (citation omitted).) "The plaintiff's choice is entitled to less deference, however, where the forum is not the plaintiff's home and the cause of action did not arise in the forum." (Benjamin, 2015 WL 1632459, at *2 (citation omitted).) "Overall, district courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered

31

on a case-by-case basis." (Id. (citations and internal quotation marks omitted).)

Here, the convenience and interests of justice factors favor transfer to the Western District of North Carolina. Plaintiff concedes that factors of trial efficiency and forum's familiarity with governing law are neutral as both forums are suited to adjudicate Plaintiff's Section 1981 and Title VII claims. (Opp. at 24.) It appears that most of the witnesses would be Defendants' employees, and this factor is also neutral as Plaintiff states that "defendants 'presumably can compel the testimony of their employees without requiring a subpoena.'" (Id. (citation omitted).) Defendant Fowler, who has had so few contacts with this District that the Court likely lacks personal jurisdiction over him,[9] has significantly more contacts with the Western District of North Carolina as Mr. Fowler attested that he directed work-related correspondence to Plaintiff in that District. (Fowler Decl. ¶ 7.) Further, as discussed above, the Western District of North Carolina is the place where the operative facts occurred, and thus more of the events and actors relevant to proving liability can be found there. After a quick review of the TAC, it was hard for the Court to understand why

---

[9] Federal district courts have power to transfer a case even if there is no personal jurisdiction over a defendant. (Corke v. Sameiet M.S. Song of Norway, 572 F.2d 77, 80 (2d Cir. 1978); see also Meyer v. Bd. Of Regents of the Univ. of Okla., 597 Fed. App'x 27, 28 (2d Cir. 2015) (summary order) (citing Corke for this proposition).)

Plaintiff brought her claims here.  Only after a detailed parsing of Plaintiff's submissions and drawing all inferences in Plaintiff's favor did the Court see the connection, although weak at times, to this District.  Because the Court finds that the Western District of North Carolina is a more appropriate forum, the Action is also transferred pursuant to Section 1404(a).

V.   Conclusion

For the foregoing reasons, pursuant to 28 U.S.C. §§ 1404(a) and 1406(a), venue of this case is hereby transferred to the Western District of North Carolina.  The Clerk of the Court is directed to close the docket in this case.

SO ORDERED.

Dated:     March 15, 2016

           New York, New York


                              Deborah A. Batts
                              United States District Judge